# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* BROWN, Minors.

UNPUBLISHED
September 13, 2018

No. 342028
Ingham Circuit Court
Juvenile Division
LC No. 17-000810-NA

Before: SWARTZLE, P.J., and JANSEN and O'BRIEN, JJ.

PER CURIAM.

Respondent-father (hereinafter, respondent), appeals as of right an order terminating his parental rights to his three minor children, pursuant to MCL 712A.19b(3)(b)(*i*) (sibling of the minor children has suffered physical injury and there is a reasonable likelihood the minor children will suffer injury in the foreseeable future), MCL 712A.19b(3)(b)(*ii*) (sibling of the minor child has suffered physical injury and the parent who had the opportunity to prevent the physical injury failed to do so), MCL 712A.19b(3)(j) (reasonable likelihood that the minor children will be harmed if returned to the home of the parent), and MCL 712A.19b(3)(k)(*v*) (parent abused the minor children or a sibling which resulted in life-threatening injury and there is a reasonable likelihood the minor children will be harmed if returned to the parent).[1] On appeal, respondent argues that the trial court clearly erred when finding that statutory grounds supported termination of his parental rights, and further, that termination of his parental rights was not in the best interests of the minor children. We affirm.

## I. RELEVANT FACTS AND PROCEDURAL HISTORY

This appeal arises out of the termination of respondent's parental rights to his three minor children following the death of his fourth minor child, who was two months old at the time of his death. On May 11, 2017, petitioner, the Michigan Department of Health and Human Services (the DHHS) filed a petition for permanent custody of the three minor children, and requested termination of respondent's parental rights pursuant to MCL 712A.19b(3)(b)(*i*), 712A.19b(3)(b)(*ii*), 712A.19b(3)(j), and 712A.19b(3)(k)(*v*). The petition alleged that it was contrary to the welfare of the minor children to be returned to respondent's care and custody

---

[1] The minor children's mother was also a respondent in this action, and had her parental rights terminated. However, she does not challenge termination of her parental rights in this Court.

-1-

because the fourth minor child had "suffered death while in the care of [respondent]." The fourth minor child, like two of his older siblings, had "presented with inexplicable injuries." The petition went on to detail that on March 3, 2017, the Ingham County Child and Protective Services (CPS), a division of the DHHS, "received a complaint alleging [respondent] as [a] perpetrator[ ] of physical neglect, [the fourth minor child] is the victim and has suffered death as a result."

The Lansing Police Department responded to respondent's home on March 3, 2017 after the minor children's mother found the fourth minor child "unresponsive in his bed & called 911." The child was pronounced dead at the scene. Respondent told officers that he and his wife had been "drinking alcohol & smoking marijuana with a friend the night before." The child's mother fed him and put him to bed around 11:00 p.m. The next morning respondent awoke to his wife screaming that the child was cold to the touch. The petition went on to allege that on March 4, 2017, CPS was informed that the "preliminary finds of the autopsy performed on [the child's] body found bruising on the right side of his face and traces [of] blood in his liver, brain, and stomach." Neither parent claimed to have any knowledge of the child's injuries. The child's cause of death was listed as "multiple injuries," and his manner of death was classified as a homicide.

The petition further detailed that on March 21, 2017, the three older minor children were examined by Dr. Stephen Guertin who reported that respondent's oldest son and respondent's daughter exhibited various injuries that were suspicious for abuse. Respondent's oldest son "had two dig-mark type scars on his neck, a U-shaped faded bruise on the left back, and a faded semicircular bruise which may be a bite or remnants of an old loop mark." Respondent's daughter "had a patterned rectangular mark which looked like a burn scar." Again, neither parent claimed to have any knowledge of the children's injuries.

An amended petition for permanent custody was filed on August 30, 2017. In the amended petition, recent developments regarding the three minor children were detailed. Specifically, following a well child visit, it was determined by Dr. Aimee Leisure-Martins that respondent's oldest son and respondent's daughter both demonstrated "adequate growth," but had "global developmental delays," likely due to neglect. Additionally, respondent's youngest son was seen by Dr. Nathan Gonik who diagnosed him with "severe to profound hearing loss bilaterally." Respondent's youngest son underwent a surgical procedure for his hearing, and although respondent was provided with "gas cards and offered transportation," he chose not to attend. The doctors at Children's Hospital of Michigan informed CPS that the child's hearing loss "could have been prevented if treatment had been sought earlier." Dr. Leisure-Martins also saw respondent's youngest son for a well visit, and indicated that the child was "a[n] 18-month-old male, with failure to thrive, and global developmental delay[s]," likely as a result of neglect.

The trial court conducted an adjudication hearing on October 2, 2017. The trial court heard testimony from various officers involved in the case, as well as Dr. Michael Markey, a forensic pathologist at Sparrow Hospital in Lansing, Michigan, who performed the autopsy on the fourth minor child. Dr. Markey testified that the child had bruising around his right eye and right knee, and significant internal injuries, including:

lacerations or tears in the liver tissue associated with bleeding. There was bleeding both over the surface of the liver and the areas where the liver was torn and there was free blood within the abdominal cavity itself what is called the peritoneal cavity. When the head was open, there was evidence of bleeding over the surface of the brain. Most significantly what we would call subdural hemorrhage which is bleeding between the fibrous coverage of the skull and the surface of the brain, brain itself.

These injuries appeared to be fresh, as there was no evidence of healing. Dr. Markey testified that the child's manner of death was determined to be homicide because there "was no explanation for these injuries and these injuries in an infant would most likely have been caused by another person or persons." After the conclusion of testimony, the trial court indicated that there was a preponderance of the evidence to "find that statutory grounds exist to exercise jurisdiction over all three children in the household at that time[.]" The trial court went on to find that "there's an unfit home environment by reason of neglect, cruelty, definitely neglect." Accordingly, the trial court took jurisdiction over respondent's three minor children.

The two day termination trial in this matter began on December 5, 2017, and continued on December 15, 2017. The trial court heard testimony from Dr. Guertin, who testified that when he examined respondent's oldest son, he had a small bruise near his left eye, as well as a faint loop shaped bruise on his back, and two semi-circular "marks or loops on the right anterior thigh." Dr. Guertin explained that marks or bruises from loops are "usually from a looped over instrument," like a belt. Respondent's oldest son also had dig marks from fingernails on his neck. Additionally, respondent's daughter had some redness below her left eye and a rectangular burn-like scar on her left upper arm.

Dr. Guertin, who also works as part of the Child Death Review Team in Ingham County, testified that he had reviewed the autopsy report of the fourth minor child. Dr. Guertin opined that, "the baby was likely beaten to death or died as a result of the beating that he received." Specifically, Dr. Guertin explained that:

The child had bruising on the right side of the face with linear marks running through the bruises. That's usually from being hit and the linear marks are from where the blood vessels on the skin rupture and they rupture generally in-between the fingers that that gives you lines which he had. The child also had effused bleeding around the brain in what we call the subdural space which in a two-month-old it's not likely they can do themselves anything that would cause that. It has to be the result of either shaking or of impact and you already have evidence of that which is the blow to the right side of the face. And then the baby also had an acute subarachnoid hemorrhage so this is hemorrhage right over the very top of the brain sitting pretty much right on top of the brain. And that almost always is from impact. And, again, you have evidence of an impact to the right side of the face. And then there were several areas of lacerations of the liver so that would imply a really significant blow to the child's belly to lacerate the liver and then there was blood within the peritoneal cavity from the broken liver, from the lacerated liver. The amount of blood found in the peritoneal cavity wouldn't I don't think account for the baby's death. There wasn't that much. There was

> about 40 CC's of blood and, um, in a two-month-old baby, yea, that, that wouldn't even be a fifth of the child's total circulating blood volume so I don't think the child died of blood loss. I think the child died from a head injury but the liver injuries are consistent, again, with a child who was beaten, beaten badly enough to tear his liver.

These injuries were comparatively consistent with falling "from a mountaintop or from four stories or been involved in rollover accident in a motor vehicle and been unrestrained[.]" Dr. Guertin noted that due to the child's young age, approximately two-months-old, the child would not have been crawling, turning over, or in other ways moving around on its own such that he could have injured himself so severely. Dr. Guertin further opined that contrary to respondent's assertion, there was no way that the minor child had died of sudden infant death syndrome.

Dr. Ronald M. Horowitz, a clinical professor at Michigan State University College of Medicine, testified in support of respondent's position that the child had died from sudden infant death syndrome (SIDS). Dr. Horowitz had reviewed the autopsy report in this case, as well as a neuropathologist report, and the scene investigation report. Based on his review, Dr. Horowitz did not think there were "sufficient changes documented to support" the opinion that the fourth minor child's death was a homicide. Rather, Dr. Horowitz testified that "51 percent [the] child could have had a sudden infant death syndrome event. There could have been secondary changes with the mother trying to resuscitate the child."

The trial court also heard testimony regarding respondent's behavior during his supervised parenting time. Originally, respondent's parenting time took place at the home of Monica Granberry, respondent's aunt, who was caring for the minor children. However, after communication broke down between respondent and Granberry, visitation was moved to a visitation center. The minor children were always excited to see their parents, however respondent and the minor children's mother would occasionally raise their voices at each other during the visits, which confused the children. If respondent and his wife were having a difficult time getting along,

> they would sit there quietly and the children would kind of kind of figuring themselves out. Um, if the children wanted to play, if mom or dad were upset, the children would kind of be sitting down and waiting for mom and dad [to] decide[ ] to interact with them again.

Additionally, respondent was occasionally too rough with the minor children. For example, "[i]f the children are crying, um, dad would sometimes pick them up and kind of roughly, kind of throw them on the couch, um, and ask them to stay there till they quiet down." Respondent would occasionally "ignore" the minor children.

The parent's relationship with each other would affect the minor children's behavior during visitation. Respondent's oldest son would pick up on the tension and become, "very agitated," and would "hit or kick" and "bite." Respondent's daughter had also started to "bite and hit." Respondent would also leave parenting time, on average, 15 minutes early. There was also some testimony regarding respondent's drug use. Although not court ordered, respondent

had submitted to some drug screens before attending his supervised parenting time. Respondent's drug screen came back positive for cocaine.

The trial court also heard testimony that while in foster care, the minor children had been evaluated regarding their developmental delays. All three children were evaluated to have been developmentally delayed by several months. Respondent's youngest son, who was 18-months-old, had "communication, fine motor, gross motor, social emotion, and some possible visual concerns." Additionally, respondent's youngest son was not yet walking independently. Respondent's daughter, who was two years and six months old at the time of the evaluation, had delays in "cognitive communication, fine motor and social/emotional" skills. She was determined to have a 20 percent delay in development, meaning she was evaluated at being between at a 18 and 25 month level, when she was approximately 29 months old. Respondent's daughter was referred for speech and language therapy.

Since being placed in foster care, the minor children had been receiving the therapy they needed. Respondent's youngest son had gained weight and was walking. He had also begun to learn sign language and better interact with the people around him. Respondent's daughter had progressed quickly during her speech therapy, and respondent's oldest son's "attitude" and behavior had continued to "get better and better."

After the conclusion of testimony, the trial court gave its findings. Specifically, the trial court concluded that the fourth minor child's death "was horrific, and quite frankly, caused by again one or both of the parents." With respect to the three other minor children, the trial court found that respondent's oldest son "has also suffered physical abuse at the hands of one or both of his parents." The trial court continued, stating

> I want everybody to understand how little these children are. These are still very young children. Whooping a two-year-old is inappropriate quite frankly. Whooping a three-year-old is inappropriate. In this court's opinion you don't whoop anybody and especially when you're getting to the point that you're leaving . . . loop marks.

The trial court also touched on the fact that the minor children were "significantly behind in their development." Respondent's youngest son was not even walking or standing, had significant hearing loss, and was diagnosed as medically fragile. Respondent's daughter had significant developmental delays, and respondent's oldest son had various emotional issues. The trial court also addressed parenting time, articulating,

> there's been a lot of testimony regarding the parents' lack of insight and ability to properly parent the children even during supervised parenting time. The grabbing of the children, pulling up a little kid by the arm and throwing him on a couch more than once.

The trial court further reiterated that respondent yelled at the minor children, despite various developmental delays and the youngest son's hearing loss. Moreover, the trial court stated, it was "significant" that when respondent's son underwent a surgical procedure,

a lot of effort had been made to engage these parents to even attend surgery and they didn't do it. They're not going to medical appointments. They're not doing what they need to do to understand the circumstances of these current children that they do have, that they have the ability to try to parent and that they don't make the effort to do that.

Based on the foregoing, the trial court found that clear and convincing evidence was presented by the petitioner to terminate respondent's parental rights under MCL 712A.19b(3)(b)(*i*), MCL 712A.19b(3)(b)(*ii*), MCL 712A.19b(3)(j), and MCL 712A.19b(3)(k)(*v*). The trial court found that it was "very confident that one or both of these parents contributed and caused the physical abuse to" the fourth minor child that lead to his death. Accordingly, based on the conduct of the parents in relation to the other three minor children, there was "absolute reasonable likelihood that the other children would suffer from injury or abuse in the foreseeable future [if] placed back in the parents' home." Further, based on the doctrine of anticipatory neglect, "treatment of one child is indicative of how other children will be treated by the parents, we have suspicious, suspected abuse" regarding respondent's oldest son and respondent's daughter. The trial court went on to find that respondent had not "progressed," meaning he did not attend to the medical needs of his children, did not attend medical appointments, did not benefit from any type of parenting class. Finally, the trial court found that there was "no question in this court's mind that [the fourth minor child] suffered a life threatening injury based upon the abuse of one of both of the parents in this matter."

Moreover, the trial court concluded that it was in the best interests of the minor children to terminate respondent's parental rights. The trial court acknowledged that the minor children were bonded to their parents, however, the trial court felt that the bond was outweighed by the "horrific" death of the fourth minor child, respondent's inappropriate behavior during supervised parenting time, his failure to attend to the minor children's medical needs, his failure to attend medical appointments or procedures, and his failure to benefit from parenting classes. The trial court did not find that respondent would be able to provide permanence, finality, and stability for the minor children in a reasonable amount of time, and that the minor children's needs were being met in their current placement with respondent's aunt. Accordingly, respondent's parental rights to his three minor children were terminated. Following trial, a termination order was entered on December 15, 2017. This appeal followed.

## II. STATUTORY GROUNDS

Respondent first challenges the trial court's determination that there were statutory grounds to terminate his parental rights. We disagree.

"This Court reviews for clear error the trial court's factual findings and ultimate determinations on the statutory grounds for termination." *In re White*, 303 Mich App 701, 709; 846 NW2d 61 (2014). A trial court's findings of fact are clearly erroneous if this Court is "definitely and firmly convinced that it made a mistake." *Id*. at 709-710. "To terminate parental rights, the trial court must find that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been proved by clear and convincing evidence." *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011). This Court reviews questions of statutory interpretation de novo. *In re Harper*, 302 Mich App 349, 352; 839 NW2d 44 (2013).

The trial court found that clear and convincing evidence of statutory grounds for termination under MCL 712A.19b(3)(b)(*i*), MCL 712A.19b(3)(b)(*ii*), MCL 712A.19b(3)(j), and MCL 712A.19b(3)(k)(*v*). We first address termination under MCL 712A.19b(3)(b)(*i*) and (b)(*ii*), which provide that statutory grounds for termination exist where:

> (b) the child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:
>
> * * *
>
> (*i*) The parent's act caused the physical injury or physical or sexual abuse and the court finds that there is a reasonable likelihood that the child will suffer from injury or abuse in the foreseeable future if placed in the parent's home.
>
> (*ii*) The parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and the court finds that there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home.

The record in this case established that respondent's fourth minor child sustained severe physical injuries that ultimately lead to his death. Specifically, the child had bruising around his right eye and his right knee, and the autopsy report detailed significant internal injuries, including multiple lacerations or tears in the liver associated with bleeding, bleeding on the surface of the liver and the areas where the liver was torn, free blood within the abdominal cavity, bleeding on the surface of the brain, and a "subdural hemorrhage which is bleeding between the fibrous coverage of the skull and the surface of the brain" itself. The child's death was ruled a homicide.

Neither parent has admitted to inflicting the injuries that lead to the death of respondent's fourth minor child. However, as the child's only caregivers, either respondent or his wife are responsible for causing the child's severe physical injuries. Regardless if respondent was not the parent who caused the child's death, as a caregiver in the home, respondent would have had an opportunity to prevent the physical injuries but failed to do so. Moreover, two of respondent's other minor children also presented with recent physical signs of abuse, which could have been inflicted by either respondent or his wife. Again, even if respondent was not physically abusing the minor children, as a caregiver in the home, he failed to prevent the abuse. During supervised visitations, respondent was observed roughly grabbing the minor children by one arm and putting them on a couch until they calmed down, and had to have his behavior corrected by supervisors. Based on the foregoing, respondent's past behavior is the best predictor of future injury to respondent's other three minor children. Accordingly, the trial court did not err in concluding that there were grounds under MCL 712A.19b(3)(b)(*i*) and (b)(*ii*) to terminate his parental rights.

Respondent also challenges termination of his parental rights under MCL 712A.19b(3)(j) and MCL 712A.19b(3)(k)(*v*). However, only one statutory ground need be proven to terminate a respondent's parental rights. *In re Trejo*, 462 Mich 341, 360; 612 NW2d 407 (2000), superseded on other grounds as stated in *In re Moss*, 301 Mich App 76, 83; 836 NW2d 182 (2013).

Accordingly, this Court need not address respondent's remaining arguments relating to statutory grounds for termination.

## III. BEST INTERESTS

Respondent also argues that it was not in the minor children's best interests to terminate his parental rights. We disagree.

This Court reviews a trial court's best interests determination for clear error. *In re White*, 303 Mich App at 713. "A trial court's decision is clearly erroneous '[i]f although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made.' " *In re Olilve/Metts Minors*, 297 Mich App 35, 41; 823 NW2d 144 (2012), quoting *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989) (citations and quotation marks omitted).

"Once a statutory basis for termination has been shown by clear and convincing evidence, the court must determine whether termination is in the child's best interest." *In re LaFrance Minors*, 306 Mich App 713, 732-733; 858 NW2d 143 (2014), citing MCL 712A.19b(5). " '[T]he focus at the best-interest stage has always been on the child, not the parent.' " *In re Payne/Pumphrey/Fortson Minors*, 311 Mich App 49, 63; 874 NW2d 205 (2015), quoting *In re Moss*, 301 Mich App at 87. "Best interests are determined on the basis of the preponderance of the evidence." *In re LaFrance Minors*, 306 Mich App at 733.

In considering whether termination is in the best interest of the minor children, the trial court may consider "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability and finality, the advantages of a foster home over the parent's home . . . the length of time the child was in care, the likelihood that the child could be returned to her parents' home within the foreseeable future, if at all, and compliance with the case service plan." *In re Payne/Pumphrey/Fortson Minors*, 311 Mich App at 63-64 (citations and quotation marks omitted). The trial court should weigh all evidence available to it when considering whether termination is the children's best interests. *Id.* at 63.

The trial court did address all of the above factors in making its best interests determination. Although respondent and the minor children appeared to be bonded, as discussed, respondent either contributed to the death of the fourth minor child or entirely failed to prevent it. Additionally, respondent was either physically abusing two of the minor children, or failed to prevent two of his other minor children from being physically abused. All three of the minor children suffered from developmental delays as a result of neglect that required the intervention of services. Further, not only was respondent's youngest son not walking, or pulling himself to stand, at 18-months-old, but he suffered from a severe bilateral hearing loss. The child required surgery, but respondent failed to attend, despite being offered transportation. Respondent also failed to attend various other medical appointments. Respondent's interactions with the children required some correction during supervised parenting time. Specifically, respondent had to be instructed more than once not to grab a young child by the arm and throw them on to a couch in an effort to get them to behave. Most importantly, however, all three minor children were thriving in their placement with Granberry. They had been getting up to speed developmentally, and Granberry was able to provide permanency, stability, and finality. Based on the foregoing,

we cannot conclude that the trial court's determination that termination of respondent's parental rights was in the best interests of the minor children was clearly erroneous.

Affirmed.

/s/ Brock A. Swartzle
/s/ Kathleen Jansen
/s/ Colleen A. O'Brien